**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**LARRY WHEELER, et al., Individually and**
**on behalf of all those similarly situated,**

      **Plaintiffs,**

**v.**

**PENSION VALUE PLAN FOR EMPLOYEES OF THE**
**BOEING COMPANY, et al.,**

      **Defendants.**                      **Case No. 06-cv-500-DRH**

**MEMORANDUM and ORDER**

**HERNDON, District Judge:**

This matter is before the Court on the motion for relief from judgment brought by Plaintiffs Larry Wheeler, David Keeton, Maral Keeton, and Vincent Parisi (Doc. 48). For the following reasons, the motion is **DENIED**.

**I. Introduction**

The Court recently granted a request by Defendants Pension Value Plan for Employees of the Boeing Company ("the Plan"), Boeing Company, and McDonnell Douglas Corporation to dismiss this case with prejudice for failure to state a claim upon which relief can be granted. *See Wheeler v. Pension Value Plan for Employees of Boeing Co.*, No. 06-cv-500-DRH, 2007 WL 781908 (S.D. Ill. Mar. 13, 2007). In that order the Court outlined the nature of the case and its procedural history, *see id.* at *1, and it is unnecessary to repeat that recitation here. Plaintiffs have moved for vacatur of the judgment entered on the Court's March 13 order, seeking reinstatement of their claim that the Plan is excessively backloaded, in violation of ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B). In the March 13 order the Court rejected Plaintiffs'

argument that the Plan is backloaded by virtue of potential swings in the interest rate on 30-year Treasury securities used to compute the "Interest Credits" allocated annually to Plan participants' "Credit Based Accounts" under the Plan's "cash balance" design. *See Wheeler*, 2007 WL 781908, at **1-5. The documents submitted by Plaintiffs in support of their motion for relief from judgment show that, some months before the Court dismissed Plaintiffs' case, they had recognized that their theory of backloading is incorrect. *See* Doc. 48, Ex. A at 8-10, 31-33; *Id.*, Ex. B at 128-29, 130. Plaintiffs now wish to proceed on a new theory of backloading that they devised while the question of dismissal of their original complaint was sub judice, namely, that the Plan is backloaded because participants' benefits are improperly calculated under 26 C.F.R. § 1.411(b)-1(a) and (b)(2). *See* Doc. 48, Ex. A at 8-10, 31-33; *Id.*, Ex. B at 187-90. Plaintiffs' motion for relief from judgment has been fully briefed and is ripe for decision, and the Court now is prepared to rule.

## II. <u>Discussion</u>

Plaintiffs' chief argument for relief from the Court's judgment in favor of Defendants is that the Court violated liberal federal pleading standards by expecting Plaintiffs, in response to Defendants' motion to dismiss their complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to articulate a viable legal basis for the backloading claim asserted in the complaint. The Court does not agree. It is highly questionable whether the claim for backloading set out in Plaintiffs' complaint satisfied even Rule 8 of the Federal Rules of Civil Procedure, which requires, of course, only that a plaintiff present "a short and plain statement of the claim showing that the pleader is entitled to relief," and that "[e]ach averment of a pleading . . . be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (e)(1). Liberal though the federal "notice pleading" standard is, it embraces nonetheless the concept of "notice," which is to say, it contemplates that a complaint will

give both courts and defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). To this end, a plaintiff must plead "sufficient facts . . . to allow the district court to understand the gravamen of the plaintiff's complaint." *Phelan v. City of Chicago*, 347 F.3d 679, 682 (7th Cir. 2003). *See also Board of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000) (a complaint must at least "notif[y] the defendant of the claim's nature[.]"); *McKay v. Town & Country Cadillac, Inc.*, 991 F. Supp. 966, 969 (N.D. Ill. 1997) (although a plaintiff may plead conclusions, the conclusions must provide the defendant with at least minimal notice of the claim). *Accord ReSource N.E. of Long Island, Inc. v. Town of Babylon*, 80 F. Supp. 2d 52, 57 (E.D.N.Y. 2000) ("[T]he purpose of Rule 8 is to ensure that the courts and adverse parties can understand a claim and frame a response to it[.]"); *Harper v. United States*, 423 F. Supp. 192, 196 (D.S.C. 1976) ("[I]t is axiomatic that defendants in an action under the Federal Rules of Civil Procedure are entitled to . . . fair notice of actual wrong, openly stated on the basis of facts asserted . . . . Neither the court nor defendants should be required to speculate as to the actions and injuries of which the plaintiff complains.").

In this instance the allegations of Plaintiffs' now-dismissed complaint consisted of bald legal conclusions that the Plan is backloaded in violation of ERISA, forcing both Defendants and the Court to speculate as to the gravamen of the claim. A complaint that merely recites the language of the statute under which an action is brought does not satisfy even the lenient federal notice pleading standard. "[T]he guiding principle in fair notice pleading is that sufficient ultimate facts must be alleged to enable the trial judge to determine whether, if the allegations are true, a claim has been stated upon which relief can be granted. Neither a judge nor this court can test a

pleading which merely copies some of the words of the statute, violation of which is the alleged basis of the complaint." *Crest Auto Supplies, Inc. v. Ero Mfg. Co.*, 360 F.2d 896, 902 (7th Cir. 1966). *See also Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002) (noting that a complaint for retaliation in violation of the First Amendment that alleged only that a prisoner was retaliated against by prison officials for filing a lawsuit, but which failed to identify the suit or the acts claimed to have constituted retaliation, would be inadequate under federal notice pleading standards); *Kyle v. Morton High Sch.*, 144 F.3d 448, 457 (7th Cir. 1998) (holding that a civil-rights complaint was inadequate where the plaintiff alleged merely that he was terminated by his employer, a public school district, for "political and advocacy reasons," but "fail[ed] to identify any activity on his part, even in the most general terms, that triggered his termination."). "[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (emphasis in original). Further, "[c]onclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition." *Id.* As the Supreme Court of the United States recognized recently, these concerns apply especially cogently where, as here, a plaintiff seeks on the basis of a "wholly conclusory statement of [a] claim" to subject a defendant to the "inevitably costly and protracted discovery phase" of a class action. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1968, 1966 (2007).

   More importantly, even assuming that the allegations of backloading in Plaintiffs' complaint were adequate under Rule 8, the law of this Circuit is clear that, when a challenge to a complaint is properly raised under Rule 12(b)(6), a plaintiff in turn must articulate a legally sufficient basis for a claim or face dismissal of the claim. The United States Court of Appeals for

the Seventh Circuit has instructed that, while it is the case that "a complaint should be dismissed for failure to state a claim only if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,'" this famous pronouncement of the United States Supreme Court "has never been interpreted literally." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) (quoting *Conley*, 355 U.S. at 45-46). What this means for purposes of this case is that, "when presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action," and a court is not under an obligation to "invent legal arguments for litigants" in order to stave off dismissal of a complaint for failure to state a claim for relief. *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995). *See also Gilmore v. Southwestern Bell Mobile Sys., L.L.C.*, 224 F. Supp. 2d 1172, 1175 (N.D. Ill. 2002) ("[I]n the complaint itself, it is unnecessary to specifically identify the legal basis for a claim as long as the facts alleged would support relief . . . . However, in response to a motion to dismiss that raises the issue, a plaintiff must identify the legal basis for a claim and make adequate legal arguments in support of it."); *Carpenter v. City of Northlake*, 948 F. Supp. 759, 765 (N.D. Ill. 1996) ("It is not necessary to specifically identify the legal basis or legal characterization of the claim in the complaint . . . . However, in responding to a motion to dismiss or motion for summary judgment, the legal basis of the claim must be identified.").

As this Court explained not long ago, "Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning. An unresponsive response [to a motion to dismiss] is no response." *Williams v. Miller*, No. 03-524-DRH, 2006 WL 240413, at *3 (S.D. Ill. Jan. 31, 2006)

(quoting *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999)).  "In effect the plaintiff [can be] defaulted for refusing to respond to the motion to dismiss.  And rightly so."  *Id. Cf. Lekas v. Briley*, 405 F.3d 602, 614-15 (7th Cir. 2005) (a plaintiff waived an argument by failing to raise it in response to a motion to dismiss); *Walker v. National Recovery, Inc.*, 200 F.3d 500, 504 (7th Cir. 1999) (if a plaintiff who files a formally sufficient complaint does nothing to back it up after the defendant moves for dismissal, the district court may enter judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure); *Teumer v. General Motors Corp.*, 34 F.3d 542, 545-46 (7th Cir. 1994) ("[W]hat is fatal to [a] theory on appeal is [plaintiff's] failure to mention it to the district court when the time . . . come[s] in the proceedings below to present legal arguments linking the claims described in the complaint to the relevant statutory (or other) sources for relief."). *Accord Levin v. Childers*, 101 F.3d 44, 47 (6th Cir. 1996) ("A plaintiff will be found to have waived a particular legal theory if he . . . fail[s] to mention it . . . . when he should have done" in opposition to a motion to dismiss).

Defendants never filed an answer in this case, but Plaintiffs' right under Rule 15 of the Federal Rules of Civil Procedure to file an amended complaint as a matter of course before the filing of a responsive pleading was terminated when the Court entered judgment for Defendants.  *See* Fed. R. Civ. P. 15(a) ("A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served[.]"); *Paganis v. Blonstein*, 3 F.3d 1067, 1072-73 (7th Cir. 1993) ("The right under Rule 15(a) to amend 'once as a matter of course' is lost after the entry of judgment.").  "In this circuit, after a judgment has been entered, a party must have the judgment reopened pursuant to Federal Rule of Civil Procedure 59(e) or 60(b) and then request leave to amend pursuant to Rule 15(a)."  *Amendola v. Bayer*, 907 F.2d 760, 765 n.4 (7th Cir.

1990).  Plaintiffs' motion for relief from judgment was brought within ten days after the Court's

entry of judgment for Defendants and therefore is deemed to be brought pursuant to Rule 59 of the

Federal Rules of Civil Procedure.  *See United States v. Deutsch*, 981 F.2d 299, 301-02 (7th Cir.

1992); *Disher v. Citigroup Global Mkts., Inc.*, 486 F. Supp. 2d 790, 795 (S.D. Ill. 2007); *Koelling*

*v. Livesay*, 239 F.R.D. 517, 520 (S.D. Ill. 2006).  Rule 59 permits a party to file, within ten days of

the entry of a judgment, a motion to alter or amend the judgment.  *See* Fed. R. Civ. P. 59(e).

Motions under Rule 59(e) serve the limited function of allowing a court to correct manifest errors

of law or fact or to consider newly discovered material evidence.  *See Caisse Nationale de Credit*

*Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996); *Russell v. Delco Remy Div. of*

*General Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995); *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th

Cir. 1986).  Whether to grant or deny a Rule 59(e) motion "is entrusted to the sound judgment of the

district court."  *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996) (citing *LB Credit Corp. v. Resolution*

*Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir. 1995)).  *See also Andrews v. E.I. Du Pont De Nemours*

*& Co.*, 447 F.3d 510, 515 (7th Cir. 2006) (the court of appeals reviews a denial of a Rule 59(e)

motion for an abuse of discretion); *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529

(7th Cir. 2000) (same).

       In this case it would be an appropriate and fair exercise of the Court's discretion to

deny Plaintiffs' Rule 59 motion simply on the grounds of Plaintiffs' unjustified failure to present

their latest theory of the Plan's allegedly unlawful backloading to the Court while Defendants'

motion to dismiss Plaintiffs' complaint was sub judice.  *See County of McHenry v. Insurance*

*Co. of the West*, 438 F.3d 813, 819 (7th Cir. 2006) (a district court did not abuse its discretion by

denying Rule 59 relief to a plaintiff on the basis of a legal argument that should have been raised

in opposition to a motion to dismiss).  This is because "Rule 59 does not give a party the opportunity to undo its own procedural failures or present new evidence or arguments 'that could and should have been presented to the district court prior to the judgment.'"  *Brown v. Alter Barge Line, Inc.*, 461 F. Supp. 2d 781, 784 (S.D. Ill. 2006) (quoting *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996)).  *See also Wilson v. Cahokia Sch. Dist. # 187*, 470 F. Supp. 2d 897, 914 (S.D. Ill. 2007) (quoting *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995)) ("It is not the purpose of allowing motions for reconsideration to enable a party to complete presenting his case after the court has ruled against him.  Were such a procedure to be countenanced, some lawsuits really might never end, rather than just seeming endless.").  Nevertheless, in the interest of ensuring thorough appellate review of the legal sufficiency of Plaintiffs' theories of recovery in this case, the Court will proceed to evaluate whether Plaintiffs have satisfied the standard governing a grant of leave to file an amended complaint under Rule 15(a).

In this Circuit, as discussed, a plaintiff seeking to amend a complaint after judgment has been entered against him or her must first have the judgment reopened pursuant to Rule 59(e) or Rule 60(b) of the Federal Rules of Civil Procedure, then request leave to amend pursuant to Rule 15(a).  The decision to grant or deny amendment is committed, of course, to a court's discretion.  *See Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1192 (7th Cir. 1990); *United States Labor Party v. Oremus*, 619 F.2d 683, 692 (7th Cir. 1980).  Importantly, "the presumption in favor of liberality in granting motions to amend [under Rule 15(a)] is reversed after judgment has been entered."  *First Nat'l Bank of Louisville v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 933 F.2d 466, 468 (7th Cir. 1991).  *See also Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1196 (7th Cir. 1985) (stating that "justice may require something less in

post-judgment situations than in pre-judgment situations under Rule 15(a)[.]").  A post-judgment request for leave to amend a complaint can be denied for any of the ordinary reasons leave to amend may be denied, including undue delay, bad faith, prejudice to the opponent, dilatory motive on the moving party's part, or when amendment would be futile.  *See Crestview Vill. Apartments v. HUD*, 383 F.3d 552, 558 (7th Cir. 2004) (post-judgment leave to amend may be denied where the proposed amendment would be futile); *Rodriguez v. United States*, 286 F.3d 972, 980 (7th Cir. 2002) (citing *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 860-61 (7th Cir. 2001)) ("Under Rule 15, a court may deny [post-judgment] amendment due to undue delay, bad faith, dilatory motive, prejudice or futility.").

Although "in prejudgment amendment cases . . . delay alone is not reason enough to deny leave to amend," in the post-judgment context "[d]elay in presenting a post-judgment amendment when the moving party had an opportunity to present the amendment earlier is a valid reason for a district court not to permit an amendment."  *Giger v. Mobil Oil Corp.*, 823 F.2d 181, 184 (7th Cir. 1987) (quoting *Twohy*, 758 F.2d at 1196).  *See also Diersen v. Chicago Car Exch.*, 110 F.3d 481, 489 (7th Cir. 1997) (quoting *Amendola*, 907 F.2d at 764) (the trial court did not abuse its discretion in denying post-judgment leave to amend where "the amendments proposed by [the plaintiff] after the judgment was entered could and should have been suggested by him much earlier in the litigation," so that, had amendment been allowed, "the litigation would have been prolonged and the 'public interest in prompt resolution of legal disputes' impaired.") (emphasis omitted).  Further, post-judgment leave to amend a complaint may be denied on the basis of undue delay even in the absence of prejudice to a defendant.  *See Figgie Int'l Inc. v. Miller*, 966 F.2d 1178, 1181 (7th Cir. 1992).  In this case Plaintiffs have offered no legitimate explanation for their

failure to present their current theory of backloading to the Court before the dismissal of their complaint, and the Court holds therefore that amendment is barred by undue delay.

The Court holds further that Plaintiffs' proposed amendment of their backloading claim is futile.  In general, leave to amend should be denied as futile "if the proposed amendment fails to cure the deficiencies in the original pleading, or could not survive a second motion to dismiss," so that granting leave to amend "would impose upon the defendants and the courts the arduous task of responding to an obviously futile gesture on the part of the plaintiffs."  *Perkins v. Silverstein*, 939 F.2d 463, 472 (7th Cir. 1991) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  *See also Bower v. Jones*, 978 F.2d 1004, 1008 (7th Cir. 1992) ("[A]n amendment may be futile when it fails to state a valid theory of liability . . . or could not withstand a motion to dismiss."); *Williams v. United States Postal Serv.*, 873 F.2d 1069, 1072 (7th Cir. 1989) ( "When an amendment will not cure the legal deficiencies of the original complaint, the district court does not abuse its discretion by refusing to grant leave to amend.").  The Court finds that Plaintiffs' latest theory of alleged unlawful backloading of benefits under the Plan could not withstand challenge under Rule 12(b)(6).

As was discussed in the Court's March 13 order, the Plan is a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35), which means that it is required to comply with certain statutory prohibitions regarding excessive backloading of Plan benefits.  *See Wheeler*, 2007 WL 781908, at *2.  As was discussed also in the March 13 order, backloading, for ERISA purposes, is "a term of art describing a plan's use of a benefit accrual formula that postpones the bulk of an employee's accrual to [the employee's] later years of service."  *In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323, 333 (S.D.N.Y. 2006).  In general, "ERISA's

antibackloading provisions . . . prohibit defined benefit plans from establishing minimum accrual rates that cause a participant's benefits to accrue very slowly until the participant is near retirement age," *Donaldson v. Pharmacia Pension Plan*, 435 F. Supp. 2d 853, 858 (S.D. Ill. 2006), with "retirement age" in this instance being age 65 under both ERISA and the Plan.  *See Wheeler*, 2007 WL 781908, at *2 (citing 29 U.S.C. § 1002(24)).

To prevent excessive backloading of plan benefits, ERISA § 204, 29 U.S.C. § 1054, provides that a participant's rate of benefit accrual under a defined benefit plan must satisfy certain minimum accrual rates:

> (b)(1)(A) A defined benefit plan satisfies the requirements of this paragraph if the accrued benefit to which each participant is entitled upon his separation from the service is not less than – (i) 3 percent of the normal retirement benefit to which he would be entitled at the normal retirement age if he commenced participation at the earliest possible entry age under the plan and served continuously until the earlier of age 65 or the normal retirement age specified under the plan, multiplied by (ii) the number of years (not in excess of 33 1/3) of his participation in the plan.  In the case of a plan providing retirement benefits based on compensation during any period, the normal retirement benefit to which a participant would be entitled shall be determined as if he continued to earn annually the average rate of compensation which he earned during consecutive years of service, not in excess of 10, for which his compensation was the highest.

> * * * *

> (B) A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

> * * * *

> (C) A defined benefit plan satisfies the requirements of this paragraph if the accrued benefit to which any participant is entitled upon his separation from the service is not less than a fraction of the annual benefit commencing at normal retirement age to

which he would be entitled under the plan as in effect on the date of his separation if he continued to earn annually until normal retirement age the same rate of compensation upon which his normal retirement benefit would be computed under the plan, determined as if he had attained normal retirement age on the date any such determination is made (but taking into account no more than the 10 years of service immediately preceding his separation from service).  Such fraction shall be a fraction, not exceeding 1, the numerator of which is the total number of his years of participation in the plan (as of the date of his separation from the service) and the denominator of which is the total number of years he would have participated in the plan if he separated from the service at the normal retirement age[.]

29 U.S.C. § 1054(b)(1)(A), (b)(1)(B), (b)(1)(C).[1]  The provisions of ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), are known, respectively, as the "3% rule," the "133 1/3% rule," and the "fractional rule."  Substantially identical tests of backloading are set out in Section 411 of the Internal Revenue Code ("IRC").  *See* 26 U.S.C. § 411(b)(1)(A)-(C).  *See also Wheeler*, 2007 WL 781908, at *3 n.2 (citing *Boeckman v. A.G. Edwards, Inc*., 461 F. Supp. 2d 801, 813 n.7 (S.D. Ill. 2006)) (explaining that, "[b]ecause one of the purposes of ERISA is to encourage employers to establish pension plans and, correspondingly, favorable tax treatment is furnished for pension plans that comply with ERISA, many sections of ERISA have counterparts in the IRC.").

The legislative history of ERISA explains the rationale underlying ERISA's provisions governing backloading:

The primary purpose of [minimum accrual rates] is to prevent attempts to defeat the objectives of the minimum vesting provisions by providing undue "backloading", i.e., by providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement.

_____

1.   The "accrued benefit" referred to in the statute is, of course, for purposes of a defined benefit plan, "the annuity a participant in a defined benefit plan is entitled to collect upon attaining normal retirement age."  *Wheeler*, 2007 WL 781908, at *6 (citing 29 U.S.C. § 1002(23)(A)).

H.R. Rep. No. 93-807 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4688.  ERISA sets out certain statutory minimum schedules under which plan participants must become fully vested in their accrued benefits; for example, under the so-called "5-year cliff" vesting schedule, participants in a single-employer defined benefit plan must be fully vested in their accrued benefit under the plan after five years of service.  *See* 29 U.S.C. § 1053(a)(2)(A)(ii); *Freeman v. Central States, S.E. & S.W. Areas Pension Fund*, 32 F.3d 90, 93 n.8 (4th Cir. 1994).  However, minimum vesting schedules, in themselves, are inadequate to safeguard the rights of plan participants under the statute.  As a leading commentator on ERISA explains,

> Consider what might happen if the statute prescribed vesting but did not regulate accrual rates.  A plan could be designed that would vest employees in 100 percent of accrued benefits after five years, thereby complying fully with ERISA's five-year cliff vesting schedule; yet the formula for accruing benefits under the plan could provide that employees accrue no benefits (or very skimpy benefits) over, say, the first twenty years of employment.  Thereafter benefits would accrue very rapidly.

John H. Langbein, et al., *Pension and Employee Benefit Law* 157 (4th ed. 2006).  "Under such a plan, an employee would be 100 percent vested after the fifth year in a pension plan with a benefit of nothing . . . [because] 100 percent of nothing is nothing."  *Id*.

Of the three statutory tests of backloading set out in ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), and in IRC § 411(b)(1)(A)-(C), the Court is concerned here only with the question of the Plan's compliance with the 133 1/3% rule, because "the three percent rule and the fractional rule . . . 'pertain only to plans that take into account no more than ten years of service in calculating benefits.'"  *Sunder v. U.S. Bank Pension Plan*, No. 4:05CV01153 ERW, 2007 WL 541595, at *11 (E.D. Mo. Feb. 16, 2007) (quoting *Eaton v. Onan Corp.*, 117 F. Supp. 2d 812, 843 (S.D. Ind. 2000)).  *See also Wheeler*, 2007 WL 781908, at *2; *In re Citigroup Pension Plan*

*ERISA Litig.*, 470 F. Supp. 2d at 337 & n.72; *Register v. PNC Fin. Servs. Group, Inc.*, No. 04-CV-6097, 2005 WL 3120268, at *3 (E.D. Pa. Nov. 21, 2005). "[T]he 133-1/3 percent rule prevents backloading by constricting the fluctuation of accrual rates from year to year." *In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d at 333. Specifically, ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), "requires that the value of the benefit accrued in any year may not exceed the value of a benefit accrued in any previous year by more than 33%." *Sunder*, 2007 WL 541595, at *11. *See also Carollo v. Cement & Concrete Workers Dist. Council Pension Plan*, 964 F. Supp. 677, 681 (E.D.N.Y. 1997) ("The 133 1/3% Rule is met so long as (1) pension benefits accrue ratably such that participants receive, each year, a definite portion of their projected retirement benefit, and (2) the rate of accrual does not, in any given year, increase by more than 33 1/3%.").

In this case the Plan is a so-called "greater of" plan, meaning that under the Plan terms participants receive as their accrued benefit for purposes of ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A), the greater of: (1) their accrued benefit as calculated under the Plan's cash balance formula, outlined in the Court's March 13 order, *see Wheeler*, 2007 WL 781908, at *1, or (2) a minimum benefit calculated under a traditional defined benefit formula set out in the Plan document. *See* Doc. 12, Ex. A ¶ 4.1(a)-(b), ¶ 4.4. Plaintiffs argue that the Plan violates the 133 1/3% rule because, under regulations promulgated by the Secretary of the Treasury regarding ERISA's minimum accrual rates, *see Esden v. Bank of Boston*, 229 F.3d 154, 157 n.2 (2d Cir. 2000), the accrued benefits of Plan participants must be calculated as the aggregate of their accrued benefits under the Plan's cash balance formula and their accrued benefits under the Plan's minimum benefit formula. When Plan participants' accrued benefits are calculated as the aggregate of their benefits

under the cash balance formula and the minimum benefit formula, Plaintiffs argue, the result is an increases in benefit accrual of more than 33 1/3% in successive Plan years.  Plaintiffs rely upon 26 C.F.R. § 1.411(b)-1, titled "Accrued benefit requirements," which sets out the backloading requirements an employee benefit plan must satisfy in order to qualify for favorable tax treatment under the IRC.  The regulation states, "A defined benefit plan is not a qualified plan unless the method provided by the plan for determining accrued benefits satisfies at least one of the alternative methods (described in paragraph (b) of this section) for determining accrued benefits with respect to all active participants under the plan."  26 C.F.R. § 1.411(b)-1(a).  The alternative methods for determining benefit accrual outlined in the regulation are, of course, the 3% rule, the 133 1/3% rule, and the fractional rule.  *See id.* § 1.411(b)-1(b)(1)-(3).

According to 26 C.F.R. § 1.411(b)-1, "A defined benefit plan may provide that accrued benefits for participants are determined under more than one plan formula.  In such a case, the accrued benefits under all such formulas must be aggregated in order to determine whether or not the accrued benefits under the plan for participants satisfy" the 3% rule, the 133 1/3% rule, or the fractional rule.  26 C.F.R. § 1.411(b)-1(a).  It is clear from the regulation that the sense in which plan formulas must be "aggregated" for the purpose of evaluating plan backloading is that, when a participant's accrued benefit under a plan is calculated using a sequence of formulas over time, backloading must be tested by analyzing the total rate of benefit accrual as though all formulas are in place at the same time within a single plan year.  The regulation furnishes a helpful example of this:

> On January 1, 1980, the J Corporation's defined benefit plan provides for an annual benefit (commencing at age 65) of a percentage of a participant's average compensation for the period of his final 5 consecutive years of participation.  The percentage is 1 percent for each of the first 5 years of participation; 1 1/3 percent

for each of the next 5 years of participation; and 1 7/9 percent for each year thereafter.  The appropriate computation period is the calendar year.  Even though no single accrual rate under the J Corporation's plan exceeds 133 1/3 percent of the immediately preceding accrual rate, the J Corporation's plan does not satisfy the requirements of this subparagraph because the rate of accrual for all years of participation in excess of 10 (1 7/9 percent) exceeds 133 1/3 percent of the rate of accrual for any of the first 5 years of participation (1 percent).

*Id*. § 1.411(b)-1(b)(2)(iii), Example 2.

Importantly, 26 C.F.R. § 1.411(b)-1 specifically provides that, where a participant's benefit is to be determined under alternative plan formulas, the accrued benefits produced under the competing formulas are not to be aggregated for purposes of testing backloading.  Thus, the portion of the regulation dealing with the 133 1/3% rule states with respect to "[p]lan amendments" that "[a]ny amendment to the plan which is in effect for the current plan year shall be treated as if it were in effect for all other plan years."  26 C.F.R. § 1.411(b)-1(b)(2)(ii)(A).  *See also* 26 U.S.C. § 411(b)(1)(B)(i); 29 U.S.C. § 1054(b)(1)(B)(i).  Similarly, another provision of the regulation concerning "[c]hange in accrual rate" states that "[a]ny change in an accrual rate which change does not apply to any individual who is or could be a participant in the plan year is disregarded."  26 C.F.R. § 1.411(b)-1(b)(2)(ii)(B).  *See also* 26 U.S.C. § 411(b)(1)(B)(ii); 29 U.S.C. § 1054(b)(1)(B)(ii).  For example:

[I]f for its plan year beginning January 1, 1980, a defined benefit plan provides an accrued benefit in plan year 1980 of 2 percent of a participant's average compensation for his highest 3 years of compensation for each year of service and provides that in plan year 1981 the accrued benefit will be 3 percent of such average compensation, the plan will not be treated as failing to satisfy the requirements of this subparagraph for plan year 1980 because in plan year 1980 the change in the accrual rate does not apply to any individual who is or could be a participant in plan year 1980.  However, if, for example, a defined benefit plan provided for an accrued benefit of 1 percent of a participant's average compensation for his highest 3 years of compensation for each of the first 10 years of service and 1.5 percent of such average compensations for each year of service thereafter, the plan will be treated as failing to satisfy the requirements of this subparagraph for the plan year even

though no participant is actually accruing at the 1.5 percent rate because an individual who could be a participant and who had over 10 years of service would accrue at the 1.5 percent rate, which rate exceeds 133 1/3 percent of the 1 percent rate.

26 C.F.R. § 1.411(b)-1(b)(2)(ii)(B).

As 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(B) illustrates, ERISA's backloading provisions are triggered not by a hypothetical benefit that, as here, Plan participants never receive if they are eligible for a larger benefit under an alternate Plan formula; instead, those provisions are triggered by increases in benefit accrual that are tied a participant's age and years of service. As the Court noted in its March 13 order, ERISA's prohibitions of excessive backloading of plan benefits are aimed at increases in benefit accrual "intended to favor older employees and to coerce employees to remain in service until retirement age." *Wheeler*, 2007 WL 781908, at *5. Thus, 26 C.F.R. § 1.411(b)-1 is aimed at benefit accrual rates that are "structured as to evade the accrued benefit requirements of section 411(b) [of the IRC]," as when, for example, "a plan provides that employees who commence participation at or before age 40 accrue benefits in a manner which satisfies the 133 1/3 percent method of determining accrued benefits and employees who commence participation after age 40 accrue benefits in a manner which satisfies the 3 percent method of determining accrued benefits." 26 C.F.R. § 1.411(b)-1(a). Correspondingly, a provision of the regulation dealing with "[c]omputation of benefit" states that "[a] plan shall not satisfy the requirements of this subparagraph if the base for the computation of retirement benefits changes solely by reason of an increase in the number of years of participation." *Id.* § 1.411(b)-1(b)(2)(ii)(F). "Thus, for example, a plan will not satisfy the requirements of [the 133 1/3% rule] if it provides a benefit, commencing at normal retirement age, of the sum of (1) 1 percent of average compensation for a participant's first 3 years of participation multiplied

by his first 10 years of participation (or, if less than 10 his total years of participation) and (2) 1 percent of average compensation for a participant's 3 highest years of participation multiplied by each year of participation subsequent to the 10th year." *Id.*

The examples set out in 26 C.F.R. § 1.411(b)-1, several of which the Court has noted already, underscore the point that illegal backloading occurs when a plan is designed to provide higher rates of benefit accrual for participants near retirement age. More specifically, illegal backloading for purposes of the regulation means that plan participants' benefits are structured so that, as calculated under a series of formulas, their benefits increase by more than 33 1/3% per year as they approach age 65:

> On January 1, 1980, the R Corporation's defined benefit plan provides for an annual benefit (commencing at age 65) of a percentage of a participant's average compensation for the period of 5 consecutive years of participation for which his compensation is the highest. The percentage is 2 percent for each of the first 20 years of participation and 1 percent per year thereafter. The appropriate computation period is the calendar year. The R Corporation's plan satisfies the requirements of this subparagraph because the 133 1/3 percent rule does not restrict subsequent accrual rate decreases.

> \* \* \* \*

> On January 1, 1980, the C Corporation's defined benefit plan provides for an annual benefit (commencing at age 65) of a percentage of a participant's average compensation for the period of 3 consecutive years of participation for which his compensation is the highest. The percentage is 2 percent for each of the first 5 years of participation; 1 percent for each of the next 5 years of participation; and 1 1/2 percent for each year thereafter. The appropriate computation period is the calendar year. Even though the average rate of accrual under the C Corporation's plan is not less rapidly than ratably, the C Corporation's plan does not satisfy the requirements of this subparagraph because the rate of accrual for all years of participation in excess of 10 (1 1/2 percent) for any employee who is actually accruing benefits or who could accrue benefits exceeds 133 1/3 percent of the rate of accrual for the sixth through tenth years of participation, respectively (1 percent).

26 C.F.R. § 1.411(b)-1(b)(2)(iii), Example 1, 3. As will be discussed in more detail presently, the

Plan contains no provisions whereby participants' accrued benefits are increased on the basis of age and years of service as they near retirement age.

Plaintiffs assert that the issue before the Court – whether plan benefits that are computed under alternative formulas, specifically, a cash balance formula and a traditional defined benefit formula must be aggregated for purposes of testing plan backloading – is one of first impression.  In fact, this issue was addressed quite recently by the United States Court of Appeals for the Third Circuit.  In *Register v. PNC Financial Services Group, Inc*., 477 F.3d 56 (3d Cir. 2007), the court considered the question of whether a plan was backloaded in violation of 26 C.F.R. § 1.411(b)-1 where the plan provided for participants to receive the greater of their benefits under a cash balance formula or under a traditional defined benefit formula.  The plaintiffs in *Register* were participants in a traditional defined benefit plan that was converted to a cash balance design. The court explained,

> Under the prior defined benefit plan, participants age 50 and older were entitled to an early retirement benefit which included an early retirement subsidy.  When PNC converted its prior plan to a cash balance plan, the participants were given the option of either receiving the accrued early retirement benefits or the benefit they would have accrued under the cash balance plan, whichever benefit is greater.  For those participants that chose to receive the accrued early retirement benefits, their hypothetical benefits were frozen from the date of conversion until their hypothetical account balances exceeded that amount.  Then, once the cash balance exceeded the accrued early retirement benefit under the prior plan, the credits into the cash balance account would commence.

477 F.3d at 60.  The plaintiffs argued that the so-called "wear-away" provision of the plan resulted in backloading because, "[s]ince the previous growth rate of benefits had been zero" while the wear-away was in effect, the new increase in benefits participants would receive once they were eligible to accrue credits under the plan's cash balance formula would "automatically be at a rate greater than 133 1/3% of the previous growth rate."  *Id*. at 71.  The plaintiffs contended that 26

C.F.R. § 1.411(b)-1 required the plan, for purposes of testing backloading, to aggregate a participant's accrued benefits under the prior plan formula and under the cash balance formula.  *See* 477 F.3d at 71 (citing 26 C.F.R. § 1.411(b)-1(a)).  The plaintiffs, the court explained, "believe that the court should use two separate formulas to make a determination under section 1054 [of ERISA] for those participants that chose to retain their early retirement benefits:  the prior plan formula to determine their previous accrued benefits including the early-retirement subsidy and the cash balance formula once the account exceeds the benefits under the prior plan."  *Id*.

The *Register* court rejected the plaintiffs' theory of backloading for two reasons.  First, the court pointed out, the language of 26 C.F.R. § 1.411(b)-1 forbids aggregation of competing formulas for benefit accrual under a plan:

> [Plaintiffs'] argument fails . . . because it cannot surmount the barrier that the regulation they cite does not apply in cases of plan amendments.  Rather, it applies in cases where there are two co-existing formulas under a single plan.  The governing provision is section 1.411(b)-1(b)(2)(ii)(A), 26 C.F.R. 1.411(b)-1(b)(2)(ii)(A), 29 U.S.C. § 1054(b)(1)(B)(i), the plan amendment provision under the 133 1/3% rule, which states, "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years."  Thus, once there is an amendment to the prior plan, only the new plan formula is relevant when ascertaining if the plan satisfies the 133 1/3% test.  A participant's election to retain his early retirement benefits from the old plan is not relevant to this calculation.  If we treat the amended plan as in effect for all other plan years, as Congress directs us to do, appellants never would have accrued a benefit under the old plan and would have started to accrue benefits under the cash balance formula from the beginning of their employment.  Accordingly, there is no violation of the anti-backloading provisions under [plaintiffs'] aggregate-formula theory.

477 F.3d at 71-72.  Second, the court noted, the plan provisions at issue had nothing to do with the fundamental purpose of ERISA's prohibitions against excessive backloading of plan benefits, namely, preventing distinctions in the rate of benefit accrual under a plan based on a participant's age and years of service:

The purpose of the anti-backloading provision is to . . . prevent an employer from avoiding the vesting requirements through minimal accrual of benefits in early years of employment, followed by larger benefit accruals as an employee nears retirement . . . . Congress intended by the anti-backloading provision to prohibit an employer from . . . providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and . . . concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement.

* * * *

[T]he objective of the anti-backloading provisions, to prevent a plan "from being unfairly weighted against shorter-term employees," simply is not implicated by the PNC conversion.

*Id*. at 71-72 (quoting *Langman v. Laub*, 328 F.3d 68, 71 (2d Cir. 2003)).  Accordingly, the court held that the plan did not violate the 133 1/3% rule.  *See id*. at 72.

The Court finds *Register* persuasive in this case.  *See Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987) ("[W]e give most respectful consideration to the decisions of the other courts of appeals and follow them whenever we can.  Our district judges should, of course, do likewise with regard to such decisions[.]").  A participant in the Plan does not receive an accrued benefit calculated under two co-existing formulas.  Rather, a Plan participant receives a benefit under one of two separate and mutually exclusive formulas set out in the Plan, namely, the Plan's cash balance formula or the Plan's minimum benefit formula.  The Court already has held, of course, that the Plan's cash balance formula does not violate the 133 1/3% rule, *see Wheeler*, 2007 WL 781908, at **2-5, a ruling that, as Defendants point out, is the law of the case.  *See Potter v. Janus Inv. Fund*, 483 F. Supp. 2d 692, 708-09 (S.D. Ill. 2007).  In any event, Plaintiffs now concede that the Plan's cash balance formula, standing alone, does not violate the 133 1/3% rule.  *See* Doc. 48, Ex. A at 8; *Id*., Ex. B at 90.  Plaintiffs further concede that the traditional defined benefit formula used to compute a participant's minimum benefit under the Plan satisfies the 133 1/3% rule, as well

as the fractional rule.  *See* Doc. 48, Ex. A at 8; *Id.*, Ex. B at 90-91.  Thus, each of the alternative

formulas for computing the benefits of Plan participants, considered on a stand-alone basis as

required under 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(A), satisfies applicable backloading tests.  *See*

*Finley v. Dun & Bradstreet Corp.*, 471 F. Supp. 2d 485, 494-95 (D.N.J. 2007) ("[29 U.S.C.]

§ 1054(b)(1)(B)(i) requires that the [133 1/3%] rule is applied to an annual accrual under the Cash

Balance Plan as if the Cash Balance Plan had been in effect for all years and there had never been

any Traditional Plan Terms.  Thus, any effect on benefits due to the interaction between the

Traditional Plan Terms and the Cash Balance Terms cannot show a violation of 29 U.S.C.

§ 1054(b)(1)(B) by the Cash Balance Plan.") (emphasis omitted); *Richards v. FleetBoston Fin.*

*Corp.*, Civil Action No. 3:04-cv-1638 (JCH), 2006 WL 2092086, at *3 (D. Conn. July 24, 2006)

("[I]f the court assumes that the Amended Plan has always been in effect, no employees would be

subject to the wear-away effect, because all employees would have started their employment when

the cash balance plan was already in place."); *Richards v. FleetBoston Fin. Corp.*, 427 F. Supp. 2d

150, 171 (D. Conn. 2006) ("If the Amended Plan is treated as having been in effect for all plan

years, employees such as Richards would never have accrued a benefit under the Traditional Plan,

and would have started accruing benefits under the cash balance formula from the start of their

employment."); *Allen v. Honeywell Ret. Earnings Plan*, 382 F. Supp. 2d 1139, 1160 (D. Ariz. 2005)

("[I]n determining whether a new benefit formula violates the 133 1/3 percent rule, one does not

compare the new formula with the old formula; rather, the backloading question must be answered

by considering the new formula on a stand-alone basis.").

> Moreover, the accrual rates at issue clearly are not tied to distinctions of age and

service intended to favor older employees and to coerce employees into remaining in service until

retirement age.  As discussed, the provisions of ERISA and its implementing regulations governing backloading of employee benefit plans are designed to "prevent[ ] a plan from weighing the accrual of benefits heavily in favor of long-term employees at the expense of short-term employees." *Allen*, 382 F. Supp. 2d at 1160.  *See also Register*, 2005 WL 3120268, at *3 ("The anti-backloading tests prevent an employer from allowing minimal accrual of benefits in the initial years of employment to be followed by large benefit accruals as an employee nears retirement.").  By contrast, "an 'across-the-board prospective increase in benefit rates for all employees' regardless of age and years of service does not constitute unlawful backloading under ERISA." *Wheeler*, 2007 WL 781908, at *5 (quoting *Campanella v. Mason Tenders' Dist. Council Pension Plan*, 299 F. Supp. 2d 274, 284 (S.D.N.Y. 2004)).  *See also LaFlamme v. Carpenters Local # 370 Pension Plan*, 220 F.R.D. 181, 185 (N.D.N.Y. 2003) (a break-in-service provision did not violate ERISA prohibitions against excessive backloading of plan benefits, because the 133 1/3% rule "is irrelevant to across-the-board increases in benefit rates made at some future time on behalf of all current employees regardless of period of service."); *Melvin v. UA Local 13 Pension Plan*, No. 98-CV-6347CJS(F), 2003 WL 22384789, at *7 (W.D.N.Y. Sept. 26, 2003) ("[A]n increase [in benefits], applied across the board to all employees in [a future plan year] . . . would not . . . violate the 133 1/3 percent test, notwithstanding that the increase would be approximately 135 percent.").

Simply put, the backloading rule "applies to how a given plan operates at a given time and prevents it from being unfairly weighted against shorter-term employees.[.]" *Langman*, 328 F.3d at 71.  By contrast, plan provisions that "do not concentrate the accrual of benefits on any fixed tenure of employment or on a benchmark linked to the approach of retirement" are not violative of  ERISA  backloading  requirements.   *King v. Pension Trust Fund of Pension,*

*Hospitalization & Benefit Plan of Elec. Indus.*, No. 01-CV-2604 (ILG), 2003 WL 22071612, at *15 (E.D.N.Y. Sept. 5, 2003).  This is so even if an increase in benefit accrual not otherwise tied to age and years of service does not apply retroactively to former participants in an employer-sponsored defined benefit plan, given that "it would be a strange rule that would prohibit a fund from making more than a one-third increase in its across-the-board benefit rate unless that rule were retroactively applied to all former employees."  *Langman*, 328 F.3d at 71-72.  In this case, the benefit accrual rates at issue are not aimed at "providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and . . . concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement."  *Id.* at 71 (quoting H.R. Rep. No. 93-807, *reprinted in* 1974 U.S.C.C.A.N. at 4688). Instead, the Plan provisions at issue apply even-handedly among all participants, regardless of age and years of service.  As the Court recognized in its March 13 order rejecting Plaintiffs' previous theory of backloading, the terms of the Plan "are unrelated to distinctions of age and years of service" of the kind ERISA's backloading rules are intended to prohibit.  *Wheeler*, 2007 WL 781908, at *5.  Thus, the fundamental concerns underlying ERISA's prohibitions against excessive backloading are not implicated in this case.[2]

          As a last matter, the Court turns to Plaintiffs' contention that their interpretation of

---

2.    Also, as a matter of elementary contract law, it seems questionable to the Court that Plan participants' benefits must be calculated as the aggregate of their benefits under, on the one hand, the Plan's cash balance formula and, on the other, the Plan's minimum benefit formula, given that the Plan document clearly informs participants that they will receive only the greater of the two benefits, not both.  *See Donaldson*, 435 F. Supp. 2d at 868-69 (citing *May Dep't Stores Co. v. Federal Ins. Co.*, 305 F.3d 597, 601 (7th Cir. 2002)) (noting that an ERISA plan is a contract and is interpreted in a manner consistent with ordinary contract principles).

26 C.F.R. § 1.411(b)-1 is supported by the Internal Revenue Service.[3]  The Court recognized in its

March 13 order that "regulations promulgated by the Treasury Department . . . are owed . . . the

highest degree of deference by the Court."  *Wheeler*, 2007 WL 781908, at *3.  The reason is that,

when an agency issues a formal interpretation of its governing statute, speaking to a matter on which

the statute is silent or ambiguous, courts defer to that interpretation as long as it is not arbitrary,

capricious, or manifestly contrary to the statute.  *See Chevron U.S.A., Inc. v. Natural Res. Defense*

*Council, Inc.*, 467 U.S. 837, 843-44 (1984); *Arnett v. Commissioner*, 473 F.3d 790, 793 (7th Cir.

2007); *United Transp. Union-Illinois Legislative Bd. v. Surface Transp. Bd.*, 183 F.3d 606, 613

(7th Cir. 1999).  Formal interpretation occurs when an agency exercises the legislative authority that

the statute implicitly delegates to it, generally, but not always, through notice-and-comment

rulemaking or formal agency adjudication.  *See United States v. Mead Corp.*, 533 U.S. 218, 229-31

---

3.     Both Plaintiffs and Defendants have submitted evidence on this point.  To the extent this evidence consists of expert opinion testimony on questions of law, e.g., the legal meaning of ERISA and its implementing regulations, the Court has disregarded that evidence.  *See* Fed. R. Evid. 704; *RLJCS Enters., Inc. v. Professional Benefit Trust Multiple Employer Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007) (citing *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994)) (the trial judge properly excluded expert reports that "conveyed legal rather than 'expert' opinions . . . . Argument about the meaning of trust indentures, contracts, and mutual-to-stock conversions belongs in briefs, not in 'experts' reports.'").  *See also United States v. Cross*, 113 F. Supp. 2d 1282, 1284-85 (S.D. Ind. 2000) (quoting *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997)) (an attorney could not offer an expert opinion, based upon the law of Indiana, that video gaming devices of the type rented by a defendant's business to its customers were not illegal gambling devices:  "Each courtroom comes equipped with a 'legal expert,' called a judge[.]"); *Breezy Point Coop., Inc. v. Cigna Prop. & Cas. Co.*, 868 F. Supp. 33, 36 (E.D.N.Y. 1994) ("[A]n expert is prohibited from offering his opinion as to the legal obligations of parties under a contract, drawing legal conclusions concerning whether a defendant's behavior violates statutory provisions, and offering . . . conclusions as to the legal significance of various facts adduced at trial.") (citations omitted); *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 94-100 (Tex. App. 2004) (the trial court committed reversible error by allowing a law professor and a former judge to present extensive expert testimony regarding the ethical responsibilities and fiduciary duties of attorneys).

(2001).  *See also White v. Scibana*, 390 F.3d 997, 1000 (7th Cir. 2004) (quoting *Mead*, 533 U.S. at 226-27) (noting that "[f]ull *Chevron* deference is limited to cases in which 'it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority,' as when the agency engages in adjudication or notice-and-comment rulemaking," although "[o]ther agency interpretations issued pursuant to comparable authority and procedure may also claim *Chevron* deference" in limited instances); *Krzalic v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir. 2002) ("If an agency is to assume the judicial prerogative of statutory interpretation that *Chevron* bestowed upon it, it must use, not necessarily formal adjudicative procedures or its closest nonadjudicative counterpart, which is notice and comment rulemaking . . . , but, still, something more formal, more deliberative, than a simple announcement.").  In general, of course, all substantive rules adopted by an agency – that is, rules that "create law, usually implementary to an existing law" – must be created through formal rulemaking procedures.  *Board of Trs. of Knox County Hosp. v. Shalala*, 135 F.3d 493, 500 (7th Cir. 1998) (quoting *Alabama Tissue Ctr. of Univ. of Ala. Health Serv. Found., P.C. v. Sullivan*, 975 F.2d 373, 377 (7th Cir. 1992)).

In this instance the precise issue before the Court is not the reasonableness of 26 C.F.R. § 1.411(b)-1.  Instead the question to be decided is the reasonableness of the manner in which, according to Plaintiffs, the Service interprets the regulation, specifically, the regulatory requirement, discussed supra, that where a defined benefit plan provides that accrued benefits for participants are determined under more than one plan formula, the accrued benefits under all such formulas must be aggregated in order to determine whether or not the accrued benefits for participants under the plan satisfy at least one of the three regulatory tests of backloading.  In

general, of course, "deference to agency positions is not an all-or-nothing proposition." *U.S. Freightways Corp. v. Commissioner*, 270 F.3d 1137, 1141 (7th Cir. 2001). Instead, "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances[.]" *Mead*, 533 U.S. at 228. *See also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (noting with regard to the deference to be afforded an agency's opinion that "[e]ach case must stand on its own facts."). Where, as here, a case turns not on the meaning of a regulation but on an agency's interpretation of a term in the relevant regulation, this creates, naturally, an additional "layer of interpretation . . . laid on top of the regulations." *U.S. Freightways*, 270 F.3d at 1141. As a rule, a court owes "some deference to [an agency's] interpretation of [its] own regulations," but with respect to informal agency actions – those that do not conform to the notice-and-comment or other comparably formal procedures – "full *Chevron* deference is not appropriate[.]" *Id.* at 1139, 1142. *See also American Fed'n of Gov't Employees v. Rumsfeld*, 262 F.3d 649, 656 (7th Cir. 2001) (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)) ("[I]nformal agency interpretations such as those contained in 'opinion letters . . . policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law . . . do not warrant *Chevron*-style deference.'"). The reason, of course, is that, "[w]ith full *Chevron* deference, agencies could pass broad or vague regulations through notice-and-comment procedures, and then proceed to create rules through *ad hoc* interpretations that were subject only to limited judicial review." *U.S. Freightways*, 270 F.3d at 1142.

In general, informal agency interpretations such as those contained in amicus briefs, opinion letters, policy statements, agency manuals and enforcement guidelines "are entitled to respect only to the extent that those interpretations have the power to persuade[.]" *Matz v.*

*Household Int'l Tax Reduction Inv. Plan*, 265 F.3d 572, 575 (7th Cir. 2001) (citing *Skidmore*, 323 U.S. at 140).  *See also American Fed'n of Gov't Employees*, 262 F.3d at 656 (quoting *Christensen*, 529 U.S. at 587) ("[G]iven the specialized experience and broader information available to . . . an agency, these informal interpretations are 'entitled to respect' to the extent that they have the 'power to persuade.'").  The degree of deference accorded "more informal agency statements and positions" is a "flexible" one in which "factors like 'the degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position' are all relevant." *U.S. Freightways*, 270 F.3d at 1141 (quoting *Mead*, 533 U.S. at 228).  Under this flexible framework, agency interpretations that change without rational explanation or vacillate between positions receive little deference.  The Seventh Circuit Court of Appeals has recognized that, "[w]hen an agency waffles without explanation, taking one view one year and another the next," then "[c]ourts are correspondingly less willing to accept the agency's latest word as authoritative; maybe it is no better and no more enduring than the last warble."  *Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408, 412 (7th Cir. 1987) (citing *Skidmore*, 323 U.S. at 140).  *See also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987)) ("[A]n agency's interpretation of a statute or regulation that conflicts with a prior interpretation is 'entitled to considerably less deference . . . than a consistently held agency view[.]'"); *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 646 n.34 (1986) (quoting *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 411 n.11 (1979)) ("The fact that the agency's interpretation 'has been neither consistent nor longstanding . . . substantially diminishes the deference to be given to [the agency's] present interpretation of the statute.'").

In this instance the evidence put before the Court as to whether the Service interprets

26 C.F.R. § 1.411(b)-1 in the manner Plaintiffs claim that it does is, to put it mildly, highly inconclusive.  Plaintiffs' expert James Turpin, an actuarial accountant whose professional work apparently includes designing cash balance pension plans, has produced some anecdotal evidence of the Service's adherence to the position advocated by Plaintiffs.  For example, Plaintiffs have submitted to the Court a heavily-redacted letter dated March 7, 2007, to Mr. Turpin from Peter Mueller, who works as an Employee Plans Specialist in the Tax Exempt and Government Entities Division of the Service.  *See* Doc. 50, Ex. 1.  Plaintiffs claim that the letter shows that the Service has adopted their interpretation of 26 C.F.R. § 1.411(b)-1.[4]  Conversely, Defendants have produced an affidavit from Paul Shultz, Director of Employee Plans Rulings and Agreements for the Service from March 2000 until March 2005, attesting that, during the period of his employment by the Service, Plaintiffs' interpretation of 26 C.F.R. § 1.411(b)-1 was never the agency's interpretation of the regulation.  *See* Doc. 49, Ex. 1.  Specifically, Mr. Shultz attests that, during his tenure with the agency, "the Service did not take a position interpreting the regulation in [the] manner" urged by Plaintiffs and that "the Service never asserted such an interpretation of the regulation in an official manner."  *Id*. ¶ 3.  The evidence before the Court does not show that the Service has adopted Plaintiffs' interpretation of the regulation, much less that such a position constitutes a longstanding agency interpretation of the regulation.  Even assuming that the Service in fact has adopted Plaintiffs' position, nothing in the record tells the Court how the agency reached such a position (if, once again, it has reached such a position).  Under these circumstances, assuming

---

4.   By way of a supplemental filing, Plaintiffs also have submitted to the Court materials from the ERISA Industry Committee, the law firm Ivins, Phillips & Barker, the American Benefits Council, and a group of thirteen employer-sponsored ERISA industry associations that show, Plaintiffs argue, that the Service adopts Plaintiffs' interpretation of 26 C.F.R. § 1.411(b)-1.

that the Service has adopted Plaintiffs' interpretation of the regulation, the Court finds the Service's position unpersuasive and accords no deference to the agency's interpretation of the regulation at issue.

As the Seventh Circuit Court of Appeals stated in *U.S. Freightways* in declining to give deference to the Service's interpretation of the IRC, "Although we acknowledge that . . . we owe some deference to the [Commissioner of Internal Revenue's] interpretation of [tax] regulations, . . . the lack of any sound basis behind the Commissioner's interpretation, coupled with a lack of consistency on the Commissioner's own part, compels us to rule" against the agency.  270 F.3d at 1139.  *See also General Elec. Co. v. Gilbert*, 429 U.S. 125, 143 (1976) ("We . . . decline[ ] to follow administrative guidelines . . . where they conflict[ ] with earlier pronouncements of the agency."); *Morton v. Ruiz*, 415 U.S. 199, 237 (1974) (quoting *Skidmore*, 323 U.S. at 140) ("[T]he weight of an administrative interpretation will depend, among other things, upon 'its consistency with earlier and later pronouncements' of an agency . . . . In this instance the [agency's] somewhat inconsistent posture belies its present assertion."); *Heinz v. Central Laborers' Pension Fund*, 303 F.3d 802, 812 n.17 (7th Cir. 2002) (declining to accord deference to an interpretation of IRC § 411 set out in the Internal Revenue Manual:  "An agency manual is generally entitled only to whatever deference is due based on its persuasiveness.  The single statement in the manual does not tell us anything about the thoroughness of the agency's analysis or the validity of its reasoning, and we have no basis to conclude that it represents a long-standing agency interpretation.") (citations omitted); *Matz*, 265 F.3d at 574-76 (declining to defer to the Service's interpretation of the IRC where the agency had taken inconsistent positions or no position at all); *Atchison, Topeka & Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 442 (7th Cir. 1994) (according no deference to a regulation:  "The

current interpretation is inconsistent with twenty-three years of agency enforcement; notwithstanding its present plaintive cries that it has always considered this a close question, the [agency] has always enforced the [statute] in a manner opposite that of its current position."). *Cf. United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 209 (2001) (upholding a revenue ruling by the Service:  "[W]e ultimately defer to the Internal Revenue Service's reasonable, consistent, and longstanding interpretation of the [statutory] provisions in point."); *Zeigler Coal Co. v. Director, Office of Workers' Comp. Programs*, 326 F.3d 894, 901 (7th Cir. 2003) ("[W]e give deference to the [agency's] longstanding and reasonable interpretation of the statute.").  In this instance, the Court has no difficulty concluding that, even assuming for the sake of argument that the Service has adopted Plaintiffs' interpretation of 26 C.F.R. § 1.411(b)-1 – an assumption that is very difficult to make from the evidence presented – this position is not entitled to deference by the Court.

In sum, the Court concludes that Plaintiffs' proposed amendment of their backloading claim is futile, so that Plaintiffs' request for relief from the judgment entered on the Court's March 13 order will be denied.  It is worth noting that, contrary to Plaintiffs' suggestion, the Court takes very seriously the necessity of enforcing strict technical compliance with ERISA, which is critical, of course, to accomplishing the statute's broad remedial purpose, namely, "protect[ing] participants in employee benefit plans from losing anticipated benefits because their selected representatives mismanage the assets which fund their benefit programs." *Lively v. Dynegy, Inc.*, No. 05-CV-00063-MJR, 2007 WL 685861, at *13 (S.D. Ill. Mar. 2, 2007) (quoting *Khan v. Grotnes Metalforming Sys., Inc.*, 679 F. Supp. 751, 757 (N.D. Ill. 1988)).  The Court is well aware that ERISA litigation, particularly ERISA class action litigation, frequently hinges on very fine points

of technical compliance with the statute.  As a sister court sagely observed, "If you want to know ERISA and nothing else, you must look at it as math."  *Laurenzano v. Blue Cross & Blue Shield of Mass., Inc. Ret. Income Trust*, 191 F. Supp. 2d 223, 242 (D. Mass. 2002) (emphasis omitted).  In this instance, however, Plaintiffs have failed, after repeated attempts, to demonstrate any violation of ERISA, technical or otherwise, by Defendants.  This case is, unfortunately, a fishing expedition or, perhaps more properly, a treasure hunt by Plaintiffs' counsel.  The Court is in no doubt that, with enough time and consultation with experts, Plaintiffs' counsel could spin out many more theories concerning allegedly unlawful backloading of benefits by the Plan.  However, Plaintiffs' counsel already have wasted a considerable amount of the Court's time through their presentation of serial theories of liability as to the Plan's alleged excessive backloading of benefits, and it is clear that this matter needs to come to a close.  Plaintiffs' request for relief from the judgment entered in favor of Defendants pursuant to the Court's March 13 order in this cause will be denied.

### III. Conclusion

The motion for relief from judgment brought by Plaintiffs Larry Wheeler, David Keeton, Maral Keeton, and Vincent Parisi (Doc. 48) is **DENIED**.

**IT IS SO ORDERED.**

Signed this 5th day of September, 2007.

/s/      DavidRHerndon
**United States District Judge**